UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SILVER SAGE AVIATION, *et al.*,<br><br>Defendants. | Case No. 3:15-cv-00548-MMD-WGC<br><br>ORDER |

AND RELATED MATTERS

## I. SUMMARY

This is a personal injury action arising from a July 10, 2013 airplane engine failure that resulted in a non-deadly crash. Before the Court are two motions for partial summary judgment filed by: (1) Plaintiffs Rosemary Anderson ("Anderson"), Brett Cassell ("Cassell"), Robert Yost ("Yost") (collectively, "Plaintiffs") (ECF No. 164)[1] and (2) Defendants Silver Sage Aviation ("Silver Sage") and Dan Urquhart ("Urquhart") (collectively, "Defendants") (ECF No. 174). The Court has reviewed the respective responses (173, 176) and replies (175, 177) associated with these motions.

Additionally before the Court is a Motion for Determination and Approval of Good Faith Settlement ("GFS Motion") by Defendant Eagle Engines, a division of Ameritech Industries, Inc, (hereinafter, "Ameritech") (ECF No. 185). The Court has considered Plaintiffs' joinder to the GSF Motion (ECF No. 186), Defendants' opposition (ECF No. 188),

///

---

[1]Plaintiff Zurich American Insurance Company ("Zurich") filed a joinder. (ECF No. 165.)

and Plaintiffs' and Ameritech's replies (ECF Nos. 189, 191). The Court has also deliberated the arguments the parties presented at a hearing held on September 13, 2018 ("the Hearing").

For the reasons state below, the Court will deny the parties' partial dispositive motions (ECF Nos. 164, 165, 174), and grant the GSF Motion (ECF No. 185).

## II. RELEVANT BACKGROUND

### A. Relevant Facts[2]

Plaintiffs Anderson, Cassell, and Yost[3] suffered injuries when the Beech Bonanza A36 aircraft ("the Aircraft") owned and operated by Silver Sage and piloted by Urquhart crashed shortly after takeoff from Fallon Municipal Airport. (ECF No. 164-3, ECF No. 164-6 at 2, 5; ECF No. 164-2 at 6; ECF No. 164 at 2; ECF No. 186 at 2; ECF No. 188-2 at 2.) It is undisputed that the accident was the consequence of an engine failure, requiring Urquhart to make an emergency landing.

Plaintiffs claim that due to the crash, they filed for and received "workers compensation" benefits from Zurich for their medical bills. (*See* ECF No. 164 at 13; *cf.* ECF No. 5 at 13.) Zurich seeks lien recovery. (ECF No. 5 at 13; ECF No. 186 at 2.)

The pending partial dispositive motions relate to Plaintiffs' negligence claims against Defendants. Plaintiffs assert claims for common carrier negligence: regarding flying decisions post the engine failure; contending failure to maintain a seatbelt worn by Plaintiff Cassell that broke; alleging failure to instruct and assure the use of shoulder harnesses by passengers. (ECF No. 142 at 5–8.)

As to Ameritech, Plaintiffs assert negligence related to Ameritech's overhaul of the engine that failed in the crash. (ECF No. 142 at 3, 9.) Ameritech had overhauled the engine in May 2012, but the engine was reinstalled by Ugalde Aviation the following month. (*Id.*
///

---

[2]The relevant facts are undisputed, unless otherwise noted.

[3]Plaintiffs were being transported during the course of their work as employees of "Terra-Gen." (*See* ECF No. 164-2 at 5–6; ECF No. 164-2 at 11.)

at 5.) Defendants have asserted unresolved cross-claims against Ameritech. (See ECF Nos. 5, 38.)

### B. Procedural History

In their operative complaint—Fourth Amended Complaint ("Fourth AC"), Plaintiffs asserted claims under strict liability and negligence theories against multiple defendants. (ECF No. 142.) The necessary product defect basis for the strict liability claims have been eliminated, thus only the negligence theories remain. (ECF No. 186 at 3.) Certain defendants have also been dismissed from the action (e.g., *id.*; *see also* ECF No. 142 (noting Continental Motors, Inc.); ECF Nos. 18 and 19 (dismissing Defendant Beechcraft Corporation)) while Defendants Chester Ugalde and Ugalde Aviation ("The Ugaldes")—Defendants' maintenance agents—have settled, and accordingly the claims against them have been dismissed with prejudice (ECF No. 186 at 3; ECF No. 164-6 at 5). The only remaining defendants are Defendants Silver Sage and Urquhart, and Ameritech.

As noted, Ameritech has also reached a settlement with Plaintiffs for which it seeks approval by this Court. Ameritech and Plaintiffs reached a settlement after Ameritech informed the party claimants and Magistrate Judge William G. Cobb of its current precarious financial circumstances, which includes being in "run off" status with impending take over by the State of Montana, having its assets liquidated, and being placed into receivership. (ECF Nos. 185, 185-1; 185-2; 186; 186-1; 168.)

### C. The Parties' Cross Motions

Plaintiffs and Defendants have essentially presented cross-motions for partial summary judgment. In their motion, Plaintiffs seek summary judgment on the following: (1) that Defendants are common carriers and therefore governed by the heightened standard of care under Nevada law; (2) that Defendants were negligent and/or acted below the applicable standard of care in failing to instruct and assure Plaintiffs used shoulder

///

///

///

harnesses on the crash flight before takeoff and landing;[4] (3) that Plaintiff Cassell's seat belt broke and failed in the crash and therefore it was negligently maintained and inspected. (ECF Nos. 164, 165.)

Defendants oppose Plaintiffs' positions and in their own motion assert that the entire field around shoulder harnesses—i.e., on both issues of instructing and assuring use—is pervasively regulated by Federal Aviation Regulation ("FAR"), thus preempting Nevada law. (ECF Nos. 173, 174.) Defendants insist there is no FAR requirement to instruct on and/or assure passengers' use of shoulder harnesses in an aircraft operated under FAR 135—14 CFR § 135.[5] (ECF No. 174.)

At the Hearing, Plaintiffs opened argument by conceding that Nevada common carrier law on the standard of care, pertinent to the shoulder harness issues, is in fact preempted by federal regulation. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995 (9th Cir. 2013); *Martin ex rel. Heckman v. Midwest Express Holdings, Inc.*, 555 F.3d 806 (9th Cir. 2009); *Montalvo v. Spirit Airlines*, 508 F.3d 464 (9th Cir. 2007) (all supporting a conclusion of preemption on the shoulder harness issues before the Court). Thus, the Court will disregard Plaintiffs' arguments as to the standard of care under Nevada common law and instead focus on the effect of federal preemption.[6]

///
///
///
///
///

---

[4]Defendant Urquhart admits that he failed to specifically instruct (i.e., verbally brief or warn) and assure that Plaintiffs wore their shoulder harnesses on the day the crash occurred. (ECF No. 164-2 at 12, Urquhart Depo. at 184–85.)

[5]There is no dispute that the crashed aircraft was operated under FAR 135. Moving forward, the Court will simply cite to "FAR", as opposed to the parallel "CFR" (Code of Federal Regulation) cite. All relevant FAR cites may be found at "14 CFR §" followed by the exact identified FAR number, as with FAR 135 relative to 14 CFR § 135.

[6]The Court bemoans that the concession came so far into this lawsuit which was initiated in November 2015 (ECF No. 1). An earlier concession would have saved substantial resources by the parties and the Court.

## III. MOTIONS FOR PARTIAL SUMMARY JUDGMENT (ECF NOS. 164, 165, 174)

### A. Legal Standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *See id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (quoting

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

Further, "when parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits.'" *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quoting *William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions*, 139 F.R.D. 441, 499 (Feb. 1992)) (citations omitted). "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

**B.     Discussion**

  **1.     Standard of Care Pertaining to Instructing and Assuring Use of Shoulder Harnesses**

The dispositive issue on the parties' respective motions is the requisite standard of care under FAR, in relation to instructing and assuring use of shoulder harnesses.[7]

///

---

[7]In their briefs, Plaintiffs argue that the Court may rely on advisory circulars—as tantamount to regulations—for the applicable standard of care. (*See e.g.* ECF No. 176 at 20–22.)  At the Hearing, Plaintiffs appeared to have conceded that an advisory circular merely serves to give meaning to an existing FAR on an issue and cannot, by itself, create a binding obligation. To the extent the concession is wavering, the Court confirms: neither the FAR nor the Ninth Circuit contemplates that things of guidance—like expert testimony and advisory circulars—standing alone can provide a standard of care in airplane personal injury cases. *See, e.g.*, *Martin ex rel. Heckman*, 555 F.3d 806, 811 ("The concurrence argues there is a federal standard of care in all airplane personal injury cases, but that is not exclusively set by federal regulations. Instead, in *areas without pervasive and relevant regulations*, the federal standard should be set by expert testimony on standard industry practices . . . But neither *Montalvo* nor *Abdullah*, nor any language in the FAA, contemplates such a rule; *Montalvo* does not mention expert testimony at all, and *Abdullah suggests that it could be used only for interpreting the relevant federal regulations, not for setting a federal standard independent from the regulations*.") (Emphasis added.) The Federal Aviation Administration's website—provides information of which the Court takes judicial notice—relevantly explains that guidance documents, which includes advisory circulars, guidelines, handbooks, and sample applications about commercial space transportation safety and other regulatory matters—"provide information to aid understanding and compliance with specific FAA regulations." Federal Aviation Administration, Commercial Space Transportation (last modified Jun. 1, 2018), https://www.faa.gov/regulations_policies/faa_regulations/commercial_space/#advisory.

Defendants maintain that FAR does not require the pilot operating the Aircraft to have instructed and/or assured that Plaintiffs used the shoulder harnesses—which indisputably were installed in the Aircraft's passenger seats. Plaintiffs, however, contend that FAR 91.9 particularly creates the obligation.[8]

In pertinent part, FAR 91.9 provides:

> [N]o person may operate a civil aircraft without complying with *the operating limitations specified in the approved Airplane* or Rotorcraft *Flight Manual, markings, and placards*, or as otherwise prescribed by the corticating authority of the country of registry.

(Emphasis added.) Defendants do not dispute that FAR 91.9 may be applied to the Aircraft, as operated under FAR 135, so long as there is no conflict[9] between FAR 91.9 and—what they argue to be the sole applicable provision—FAR 135.171[10]. Defendants, however, insist there is a conflict between the two provisions implicitly because FAR 91.9 would be used to create a generally applicable obligation where FAR 135.171 creates none and specifically only directs the use of shoulder harness by flight crew. While this argument is sublime on its face, it is neither here nor there in terms of creating a conflict between FAR 91.9 and FAR 135.171. FAR 91.9 merely requires that a pilot complies with the operating limitations of the aircraft the pilot operates as provided in the aircraft's own

///

---

Because an advisory circular provides only guidance, it cannot be binding unless incorporated by reference into a specific FAA regulation.

[8]Plaintiffs reference other FAR sections that they claim would support their argument that the FAR creates an operative standard of care—FAR 91.3 (making the pilot the final authority in operating his aircraft and provides the pilot discretion to deviate from any rule in an emergency) and FAR 91.7 (stating that an aircraft may not be operated unless in airworthy condition and that the pilot is responsible to determine if the aircraft is in such condition "for safe flight")—but Plaintiffs ultimately based their argument on FAR 91.9.

[9]Counsel for Plaintiffs clarified that the precise inquiry is whether there is "irreconcilable" conflict.

[10]Of the regulations Defendants identify as applicable to the subject aircraft—FARs 135.117, 135.128, and 135.171—only 135.171 makes reference to shoulder harness and it provides that: "Each flight crewmember occupying a station equipped with a shoulder harness must fasten the shoulder harness during takeoff and landing, except [they need not do so where the fastened shoulder harness prevents them from performing their required duties]."

7

"[m]anual, markings, and placards." Thus, the standard of care under FAR 91.9 may vary depending on the operating limitations of an aircraft's particular manuals, markings and placards.

Here, Plaintiffs rely such operating limitations as incorporated into FAR 91.9 for the applicable standard of care. In particular, Plaintiffs provide an exhibit—*see* ECF No. 175-1 at 2–13—showing the relevant operating flight manual and handbook for the subject Beech Bonanza A36, and Defendants do not protest that the exhibit in fact comprises the applicable flight manual ("Beech Bonanza Manual"). At Section II, titled "Limitations," the Beech Bonanza Manual states that "[t]he limitations included in this section have been approved by the Federal Aviation Administration and *should be observed* in the operation of this airplane." (ECF No. 175-1 at 8) (emphasis added). Then it has a subsection labeled placards that provides directives on where to place certain placards. (ECF No. 175-1 at 9–10.) Relevant to this Court's inquiry are the following placard directives designating the following placing and wording:

> On Windows Adjacent To 3rd & 4th Seats (When Forward Facing) And 5th & 6th Seats:
>
> SHOULDER HARNESS
> MUST BE WORN DURING
> TAKE-OFF AND LANDING
> WITH SEAT BACK UPRIGHT
>
> On Windows Adjacent to 3rd & 4th Aft Facing Club Seats:
>
> SHOULDER HARNESS
> MUST BE WORN DURING
> TAKE-OFF AND LANDING
> WITH SEAT BACK UPRIGHT
> AND AFT FACING SEATS
> MUST HAVE HEADREST
> FULLY EXTENDED

(*Id.*)

Arguably, given their placement in passenger seating areas, the placards only serve to direct that passengers use their shoulder harnesses, and should not be read to create a discrete obligation that the pilot brief and/or assure use of the harnesses. Presumably, a pilot would fulfill his, or her, duty by placing the placards in the directed

locations. Defendants submit that these placards were displayed in the Aircraft. (ECF No. 174 at 4 (citing what is ECF No. 174-4).) At the Hearing, Plaintiffs suggest they had no way of verifying whether the placards were displayed because the Aircraft was discarded before they could inspect it. In any event, the placement of placards has not been identified as a substantive issue, and is at minimum disputed—which would by virtue bar summary judgment thereon.

Section VI of the Beech Bonanza Manual, titled "Normal Procedures," provides procedures for a pilot to perform at different stages of operation: e.g., "Preflight Inspection"; "Before Starting" the airplane; "Before Takeoff"; "Before Landing". (ECF No. 175-1 at 12–15.) As indicated, the latter two procedures are at issue. The "Before Takeoff" section contains the procedure to "check" seat belts and shoulder harnesses (*id.* at 14), and the "Before Landing" section provides the procedure that seat belts and shoulder harnesses are "fastened" (*id.* at 15). Because these procedures are related to the aircraft's "operating limitations"—which is the concern of FAR 91.9—the Court reads the procedures, in the context of Section II's limitations, to mean that a pilot *should observe* the noted procedures before takeoff and landing.

In Section VII, under the header "System Description," shoulder harnesses are again addressed. (ECF No. 175-1 at 16, 18.) There, the use of the word "must" shows up as follows: "When using the shoulder harnesses, the limitations stated on the cabin window placards must be observed." (*Id.* at 18.) The Court deems the statement to be limited by the qualifier "[w]hen using the shoulder harnesses," and therefore does not override the "should be observed" language in Section II—titled "Limitations". Section VII additionally muddles the Court's analysis to the degree it suggests that shoulder harnesses are not always worn.

Accordingly, the Court defers to the directives in Section II on operating limitations, and to the procedures of Section VI of the Beech Bonanza Manual, as providing the applicable standard of care. The Court finds the applicable standard of care under FAR

///

91.9 for the Aircraft is that the pilot should observe that shoulder harnesses are worn, checked before takeoff, and fastened before landing.

However, the Court's finding that FAR 91.9 establishes the standard of care does not result in the granting of summary judgment for either party. Whether Defendant Urquhart breached the established standard of care is a matter for a jury. Given the use of the word "should" in "should be observed," the Court finds the Beech Bonanza Manual permits a certain degree of discretion by the pilot in his "observations." The Court notes that the parties dispute whether the failure to instruct or assure on the day of the crash was negligent considering Plaintiffs had flown with Urquhart on hundreds of other occasions, and—according to Defendants—were aware they ought to wear the shoulder harnesses. Moreover, it is also up to the jury to decide whether the standard means that the pilot should both instruct and assure that the shoulder harnesses are worn, etc., as noted. The Court therefore finds that genuine disputes bar summary judgment, for either party, on the shoulder harness issues.

### 2. Regarding Cassell's Seatbelt[11]

There are also genuine disputes of material fact on the remaining issue—whether Cassell's seat belt broke and failed in the crash because it was negligently maintained and inspected.[12]

///

---

[11] For this claim, the Court does not look to the standalone advisory circular ("AC")—AC 91-65—that Plaintiffs rely on in opposing summary judgment (ECF No. 176 at 27, 29). AC 91-65 is not binding standing alone, and Plaintiffs do not pinpoint a specific regulation that AC 91-65 *gives meaning to* in support of their argument that the AC creates a mandatory preflight inspection requirement for Defendants (ECF No. 176 at 27). *See supra* n.7. The Beech Bonanza Manual is not itself a federal regulation, therefore the Court cannot agree with Plaintiffs that AC 91-65 is somehow incorporated by reference therein. To be clear, it is undisputed that Urquhart checked and told passengers to fasten their seatbelts on the day of the accident. Plaintiffs, however, seek to impose an obligation, relying on AC 91-65, that prior to each flight a pilot *must* "check seat belt and shoulder harness webbing straps for tears, holes, and rotting." (*Id.* at 29.) Notably, Plaintiffs' expert's testimony—even after acknowledging the AC's language—indicate that a pilot need not inspect seat belt conditions on every seat before every flight. (ECF No. 174-8 at 4.)

[12] Defendants sold the salvaged aircraft frame—including seats and seat belts—before Plaintiffs could inspect it. (ECF No. 144 at 3; ECF No. 164.) In their motion, Plaintiffs included a request for partial summary judgment as sanction for Defendants' failure to

There was never a dispute that disposition of the seat belt issue is governed by federal regulation. Defendants argue that the seat belts were properly inspected for maintenance as part of the FAR required annual inspection a mere two weeks before the accident, and no maintenance problems were found. (ECF No. 174.) They additionally point to Plaintiffs' piloting expert's testimony that seat belt deterioration does not occur overnight. (ECF No. 174-8 at 4 (piloting expert Barry Schiff).) Plaintiffs respond that: (1) the doctrine of *res ipsa loquitur* is applicable to this case and creates the presumption that Cassell's seat belt failed due to Defendants' negligence; and (2) the conducted inspection was inadequate. (ECF No. 176 at 26–29.) However, whether the maintenance inspection was properly performed is an issue of fact to be determined by a jury, based on the evidence adduced at trial, and evidentiary standards provided in that context.[13] The latter point bars a grant of summary judgment for either party on the claim in light of the FAR directive Plaintiffs identify—to not operate the aircraft unless "seatbelts are in a safe, operable and airworthy condition."[14] (ECF No. 176 at 27 (referencing FARs 91.1, 91.7, 91.213, and 91.205(13).)

The parties' motions (ECF Nos. 164, 165, and 174) are accordingly denied.

## IV. GSF MOTION (ECF NO. 185)

### A. Legal Framework

In Nevada, it is within the considerable discretion of a court—considering the relevant facts available—to determine whether a settlement was made in good faith under NRS § 17.245. *Velsicol Chem. Corp. v. Davidson*, 811 P.2d 561, 563 (Nev. 1991). Where

///

---

preserve the seat and seat belt Cassell used. (ECF No. 164 at 112-13.) At the Hearing, Plaintiffs' counsel conceded that the requested sanction is unreasonable and instead requested an adverse inference instruction and evidentiary sanction. Because Plaintiffs made this latter sanction request for the first time at the Hearing, the Court declines to consider it. Moreover, whether an adverse inference instruction and evidentiary sanction should be imposed is best determine in the context of trial.

[13] *See supra* footnote 12 regarding the matter of Plaintiffs' requested adverse inference instruction and evidentiary sanction.

[14] Thus, the Court need not address Plaintiffs' contention that *res ipsa loquitur* applies here.

11

a defendant settles with a plaintiff in good faith, it cannot be held liable to its codefendants in tort for contribution or equitable indemnity. *Otak Nev., LLC v. Eight Jud. Dist. Ct.*, 312 P.3d 491, 496 (Nev. 2013) (referencing NRS § 17.245(b) (1)). This result is inherent in NRS § 17.245's goal to "encourage settlements." *In Re MGM Grand Hotel Fire Litigation*, 570 F. Supp. 913, 927 (D. Nev. 1983)

The following factors are relevant to a court's good faith determination: "[t]he amount paid in settlement, the allocation of the settlement among plaintiffs, the insurance policy limits of settling defendants, the financial condition of settling defendants, and the existence of collusion, fraud or tortious conduct aimed to injure the interests of non-settling defendants." *Id.* (internal quotation and citation omitted); *see also In Re MGM Grand Hotel Fire Litigation*, 570 F. Supp. at 927–28. (same). A court may also consider "the merits of any contribution or equitable indemnity claims against the settling defendant." *Otak Nev., LLC*, 312 P.3d at 496 (citation omitted). Moreover, the court is not limited to these factors in making its discretionary determination. *Velsicol Chem.*, 811 P.2d at 563 (declining to adopt the "California rule" mandating consideration of any specific factors).

In the process of the court's determination, "[a] non-settling party is fully protected by its ability to present counter-affidavits or evidence at a hearing on the issue of 'good faith.'" *In Re MGM Grand Hotel Fire Litigation*, 570 F. Supp. at 927.

**B.    Discussion**

Ameritech is joined by Plaintiffs in seeking a determination that the settlement between them was made in good faith pursuant to NRS § 17.245 and requesting the Court approve said settlement. (ECF Nos. 185, 186.) Defendants particularly argue the settlement was not in good faith because: (1) the proposed payment by Ameritech is "grossly disproportionate" to its liability to Plaintiffs; (2) the GSF Motion and joinder are erroneously premised on the assertion that the only claims remaining against Defendants are unrelated to the engine failure—the tort attributed to Ameritech; and (3) Defendants will be prejudiced by having their "meritorious" cross-claims against Ameritech extinguished. (ECF No. 188.) Because the Court finds Ameritech's financial condition to

be of paramount concern, the Court will approve the settlement has having been made in good faith.

Here, the proposed settlement is for a total sum of $30,000— apportioned $13,750 to Yost and Zurich; the same amount to Cassell and Zurich, and $2,500 to Anderson and Zurich. (ECF No. 186 at 4.) Ameritech claims the $30,000 is the most it can offer. At the Hearing, Ameritech's counsel explained that there are approximately 22 other open claims against members of Ameritech's risk retention group, with significantly insufficient funds available to pay all claims, pay for the defense, and operate run-off.[15] (*See also* ECF No. 185-2 (James Bridgeman—Ameritech's General Manager's declaration, under penalty of perjury, stating that Eagle Engines "ceased operation in 2015 and has no assets," and its parent company—Ameritech—"has insufficient assets, and has no viable capability to settle any judgment against it"). It is uncontested that the $30,000 settlement was entered upon the recommendation of Magistrate Judge William G. Cobb and a due diligence inquiry by Plaintiffs into Ameritech's financial circumstances. (ECF No. 189 at 10–11; *see also* ECF No. 168 (noting partial settlement); ECF No. 186-1 (counsel for Plaintiffs representing having done a "due diligence inquiry to confirm the financial status" of Ameritech and its risk retention group, which included confirmation from the Montana Division of Insurance).) Defendants provide no evidence to the contrary. Additionally, Ameritech expresses, in briefing and at the Hearing, that it seeks the settlement mainly because of its financial predicament and not because it in any way admits liability. (ECF No. 185 at 4.) The Court considers this prima facie evidence of good faith.

Defendants appear to be primarily concerned with the extent of liability because they argue that Ameritech's overhaul of the engine is responsible for the crash and injuries, and therefore it would be unfair to honor a $30,000 settlement where Plaintiffs seek

///

---

[15] Defendants challenge Ameritech's insurance policy limit as undemonstrated (ECF No. 188 at 11), but this argument is a red herring and nondeterminative. *See Otak Nevada, L.L.C.*, 312 P.3d at 497 ("[W]e have declined to treat insurance policy limits as exclusive criteria in determining whether a settlement is in good faith.") (citation omitted). There is also no evidence, or basis from which the Court could infer, that settlement was reached through fraud and collusive efforts aimed to injure Defendants' interests.

millions in recovery. (See ECF No. 188 at 10.) Under different circumstances, the Court may have been convinced by Defendants' argument. In *Otak Nev, L.L.C.*, the Nevada Supreme Court noted that a settlement may be deemed to be in good faith "so long as it is not '*disproportionately* lower than [the settling defendant's] fair share of damages'" where the settling defendant's liability is minimal. 312 P.3d at 496 (quotation and citation omitted) (emphasis added). In such a case, "a settling defendant would not be required to pay the full amount of its potential liability, as such a requirement 'would unduly discourage settlements'" *Id.* at 496–97. (citation omitted). "[A] defendant with minimal liability to the plaintiff will also have minimal liability for contribution or equitable indemnity to co-defendants, [therefore,] permitting a smaller settlement does not prejudice the non-settling defendants. *Id.* at 497 (citation omitted). However, in this case apportionment of liability has been rendered secondary to Ameritech's financial condition and its inability to pay more than the settlement amount. In fact, Plaintiffs express concern that Ameritech may lack the funds to pay even the agreed to $30,000 settlement amount. (ECF No. 186 at 5.)

Furthermore, the issue of liability is not as clear as Defendants present. The parties dispute the merits of the claims—most relevantly the merits of Defendants' cross-claims against Ameritech. At the outset, Plaintiffs contended that Ameritech's overhaul of the engine resulted in premature wear of the engine's internal components, which caused it to fail, and Plaintiffs proffered expert opinion in support of that position. (*Id.* at 9; *see also id.* at 6–7; ECF No. 188-4 (report by expert Arthur Lee Coffman of Aero Services Unlimited).) Defendants' expert also opined that the engine failure was caused by the failure of a connecting rod, resulting in loss of power, and that a loss in connecting rod pre-load due to improper torqueing will result in a fatigue failure of the engine rod assembly. (ECF No. 188-2 at 10 (expert Manuel Raefsky); ECF No. 189 at 8 (identifying Raefsky as Defendants' expert).) Ameritech contest liability, providing its designated engineering expert's opinion that, if accepted, would exonerate it. (ECF Nos. 185, 191; ECF No. 191-1 at 4–5 ("Introduction", "Summary and Conclusions" by Professional Analysis and Consulting, Inc.); ECF No. 192-2 at 2–3.) Ameritech's position is that there

was no improper torqueing and the negligence occurred at the point of installation by The Ugaldes. (*Id.*) Ameritech's mechanic testified that he torqued the connecting rod bolts or fasteners approximately .8 more than the maximum torque specifications (ECF 188 to record ECF No. 188-3 at 28–29 (William Orr Depo.).) Plaintiffs have expressed their present belief that Ameritech is little, if at all, responsible for the engine failure (ECF No. 189 at 7–8). They ground their new position on the opinion of the National Transportation Safety Board—that the nuts and bolts were properly torqued (*id.*; 189-5 at 3).

In its discretion, the Court will remain neutral on the merits issue which is dwarfed by Ameritech's current financial situation. It is likewise relatively a minute point whether Defendants' remaining claims are unrelated to the engine failure. The Court recognizes that under NRS § 17.245, the good faith determination is primarily concerned about the settlement vis-à-vis plaintiffs and the settling defendants, and with encouraging such settlement, albeit the determination being inherently detrimental to the ability of a non-settling defendant to recover from a co-tortfeasor. *See The Doctors Co. v. Vincent*, 98 P.3d 681, 688 n.28 (Nev. 2004) ("We recognize that the 1997 amendments to NRS [§] 17.245, precluding indemnity actions where the indemnity obligor's settlement is in good faith, are not in doctrinal harmony with a right of implied indemnity. Such factors as the possibility of the putative indemnity obligor may be completely exonerated, which bear on the good faith of the obligor's settlement, do not account for the fact that a full shifting of liability may be justified under the facts at trial, and that a nominal good-faith settlement should, as a matter of public policy, never insulate a tortfeasor from indemnity liability. However, the Legislature has determined that *the preeminent consideration is encouragement of settlement . . . .*") (Emphasis added.)

Based on the foregoing, the Court finds sufficient evidence exists to support a finding that Ameritech and Plaintiffs reached settlement in good faith. NRS § 17.245 therefore bars Defendants' cross-claims against Ameritech.

To be clear, Defendants may still argue third-party culpability. *See Banks ex rel. Banks v. Sunrise Hosp.*, 102 P.3d 52, 67 (Nev. 2004). That is—as Plaintiffs admit (ECF

No. 189 at 11 n.4)—Defendants may argue in their defense that the crash and related injuries were entirely "non-party," Ameritech's responsibility. *Id.* (referencing NRS § 41.141 and explaining that "NRS [§] 17.245 does not prevent a defendant from pointing the blame at another defendant or from arguing that it was not responsible for the plaintiff's injury"). This argument would be short of "admit[ting] evidence in support of 'comparative fault' or apportionment analysis". *Id.* Further, Defendants may seek to mitigate a damage award against them by asking the jury to "compare" their degree of negligence with that of a non-party. *See id.* (noting that a jury may "'compare' the negligence as between parties and nonparties"). For these additional reasons, the Court will grant the GFS Motion.

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that the parties' motions for partial summary judgment (ECF Nos. 164, 165, 174) are denied due to the existence of genuine issues of material fact as determined above.

It is further ordered that the Motion for Determination and Approval of Good Faith Settlement by Defendant Eagle Engine, a Division of Ameritech Industries, Inc. (ECF No. 185) is granted, in the Court's considerable discretion. The Court dismisses Eagle Engine and/or Ameritech from this lawsuit and all claims and cross-claims against them with prejudice.

DATED THIS 18th day of September 2018.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE